148 A.2d 343 (1959)
William ELSTER and Ray Wolf, Plaintiffs,
v.
AMERICAN AIRLINES, Inc., et al., Defendants.
Court of Chancery of Delaware, New Castle.
February 19, 1959.
*344 William E. Taylor, Jr., Wilmington and William E. Haudek, of Pomerantz, Levy & Haudek, New York City, for plaintiffs.
Richard F. Corroon, of Berl, Potter & Anderson, Wilmington and Debevoise, Plimpton & McLean, New York City, for defendant American Airlines, Inc.
E. N. Carpenter II, of Richards, Layton & Finger, Wilmington, for the individual defendants.
MARVEL, Vice Chancellor.
The complaint herein as amended sets forth a stockholders' derivative action which attacks the validity of stock options on the grounds that such options granted to the individual defendants without formal consideration and immediately exercisable on delivery were legally deficient under the doctrine of the Kerbs case, Kerbs v. California Eastern Airways, 33 Del.Ch. 69, 90 A.2d 652, 34 A. L.R.2d 839. Plaintiffs accordingly contend that stock issued as a result of exercise of such options constituted an improper partial gift of corporate assets being made without unanimous stockholder approval. Plaintiffs seek a decree not only cancelling the stock so issued but requiring the individual defendants to surrender such shares and to account for profits whether in the form of dividends or otherwise.
Following denial of the corporate defendant's motion for summary judgment,[1] appearances were entered for a substantial number of the individual defendants, and affidavits in support of a new motion for summary judgment have been filed by one hundred and seventy six of the one hundred and eighty nine such defendants who have appeared.
These affidavits allege in substance that even before the spring of 1950 or 1951 affiants were aware of American's intention to make its stock available to its employees; that American's corporate charter authorizes the issuances of employee stock and that such stock was referred to in its balance sheets. Most of the affiants allege that the expectation that American's stock would be made available to its employees influenced their decision to continue in American's employ prior to the spring of 1950 or 1951, as the case might be, and all of the affidavits in one form or another go on to state that in the spring of 1950 or 1951 affiants were informed that American planned to grant stock options to its executive *345 personnel and that the expectation of receiving stock options was from that time on a factor in affiants' decision to remain in American's employ in executive capacities. The affidavits recite the award of options in either September of 1950 or May of 1952, and each affiant states that he continued in American's employ thereafter and was in part induced to remain as an employee by reason of being an option holder.
The affidavits then go on separately to give the dates of exercise of options (after a market rise), the financial arrangements made to acquire options, and commitments in the form of payments on homes and automobiles and the like made by optionees on the strength of their optioned stock.
In about one hundred of the affidavits it is alleged without specifying the exact date that part or all of the stock acquired under options was sold prior to July 10, 1956, the date on which the individual defendants were added as parties. About one hundred and fifty of the affiants state that they borrowed in order to pay for some stock, in certain instances pledging all or part of their optioned stock. With few exceptions, however, the affidavits fail to give the amount unpaid on such loans, nor do they state what would be the actual loss to a particular affiant were rescission to be granted. On the other hand, it is clear from the affidavits that substantial sums of money traceable to the acquisition of optioned stock have long since gone into living expenses including education, and certain of the defendants state that they would not have purchased specific houses, cars and other items had it not been for their acquisition of and reliance on optioned stock. It is not made clear, however, how a holding that the options here involved are invalid would lead to a situation incapable of equitable adjustment despite the hardship which many defendants would suffer as a result of being required to give up property or otherwise adjust to situations caused by changes in position made by them in reliance on the options
The general defenses advanced in opposition to the relief sought by plaintiffs are laches; acquiescence on the part of the plaintiff, Wolf; statute of limitations; estoppel; section 33, subd. 5 of the New York Personal Property Law governing so-called irrevocable offers, and inapplicability of the decisions in Kerbs and Gottlieb [Gottlieb v. Heyden Chemical Corp., Del.Ch. 99 A. 2d 507].
In advancing these defenses, defendants stress what they conceive to be the basic equities of the case, namely that neither plaintiff sought preliminary injunctive relief when options were originally issued, that plaintiffs likewise failed to seek affirmative relief when stock was later acquired by the optionees, in most cases by borrowing, or when stock was thereafter sold by certain of the defendants, who point out that over the years since this suit was filed they have responded in good faith to their employer's incentive plan, having not only rendered continuing reciprocal services to their employer but also having drastically changed their positions in reliance on the plan. The loss to American in the form of employee demoralization is weighed against the possible monetary recovery for the corporation were rescission to be granted, and the Court is urged sensibly to apply equitable principles in rejecting a stale claim which, if allowed, might well do substantially more harm than good to the over-all interests of American's stockholders.
Turning first to those defenses which have to do with plaintiffs' standing to maintain this action, it is apparent that the crux of this critical issue is whether or not plaintiffs had such knowledge of the transactions complained of as to make their failure to proceed with despatch a bar to their action. A court of equity will not permit an otherwise actionable remedy to be applied if a plaintiff's conduct is such as to constitute waiver of such remedy or its equivalent.
*346 Defendants first contend that inasmuch as this type of action is in effect brought in the corporation's right, plaintiffs are bound by the corporation's knowledge, however a stockholders' derivative suit is normally justified only when the corporation[2] itself has failed or refuses to take affirmative action to retrieve a claimed gift of corporate assets or the like, consequently the important fact to resolve here is not the corporation's but plaintiffs' knowledge and the reasonableness of action or inaction in reference to the acts complained of in the light of such knowledge.
Notwithstanding the employment of interrogatories and the filing of affidavits since the denial of the corporation's motion for summary judgment, it is still not clear on the record before me whether or not plaintiffs on acquiring knowledge of the terms and conditions of American's option plan including its legal deficiencies either acquiesced to the putting into effect of such plan in a manner that bars this suit (acquiescence being akin to ratification, differing only in that it is assent to a transaction by words or conduct during rather than after its occurrence) or stood idly by after the acts complained of when they should have acted. In other words did plaintiffs at the time they learned or should have learned of what they conceive to be fatal defects in American's option plans respond in time to be absolved of the charges of either acquiescence or laches?
The Elster suit was brought on August 27, 1952,[3] about three months after the granting of the 1952 options and about two years after the granting of the 1950 options. In the early stages of the case (which could not have been brought until the form of options had been fixed and prepared for issue) no effort was made to have the Elster case dismissed on the grounds of statute of limitations or laches, perhaps because other defenses under Rules 12 and 23 of this Court, Del.C.Ann., and the New York Personal Property Law were considered a complete bar to the action. In any event the initial opinion of then Vice Chancellor Bramhall (Del.Ch., 100 A. 2d 219) does not discuss the question of timeliness of suit, and it is the law of the case (128 A.2d 801) that insofar as rescission is sought a purely equitable cause of action has been pleaded. Furthermore, insofar as plaintiffs seek an accounting, defendants' affidavits fail to state exactly when sales of optioned stock were made.
Having brought timely suit against the corporation and acted diligently in the prosecution of an inappropriate remedy, laches may not be imputed to plaintiffs solely because of failure to join the optionees prior to June 14, 1956, the date of the Court's ruling that the optionees were indispensable parties, at least in the absence of a showing of justifiable prejudice, Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099 Nor was it in itself laches for plaintiffs to await a ruling in Frankel v. Donovan, Del.Ch., 120 A.2d 311, a case in which the options there under attack contained the same type of technical deficiencies here complained of, before insisting that this case be brought on for a ruling on the validity of American's options, Cahall v. Burbage, 13 Del.Ch. 299, 119 A. 574. Finally, the Elster suit having been filed in 1952, Mrs. Wolf's failure to enter the suit until some four years later loses its significance because of the class nature of the action, Southern Pacific Co. v. Bogert, supra, Elster's inability to attack the 1950 options being of a procedural nature (Rule 23(b)).
Having determined that plaintiffs' knowledge (particularly Mrs. Wolf's knowledge and actions in reference to the 1950 options) and not mere lapse of time is the critical element in this aspect of the case, I adhere to my decision to hear evidence before *347 determining whether either plaintiff has a standing to complain of the manner in which the options under attack were granted.[4]
Similarly, assuming it were to be determined that plaintiffs do have standing to maintain this action, did defendants, having borrowed money to acquire optioned stock, made purchases on the strength of ownership of such stock, and otherwise changed their position, acts which are not denied by affidavit, take such affirmative action in justifiable disregard of plaintiffs' attack? Here again knowledge is critical; there has been no opportunity for cross examination, and the facts must be heard before determining whether or not defendants acted reasonably.
As to the defense of the New York statute[5] (§ 33, subd. 5 of the Personal Property Law) which was rejected by then Vice Chancellor Bramhall in his opinion herein reported in 100 A.2d 219, I fail to see how the fact that the individual defendants were not parties at that time diminishes the force of such ruling. It will not be reconsidered here.
Turning to the remaining defenses, I am of the opinion that because this case is concerned with alleged non-charitable gifts by a corporation as opposed to a gift by an individual, estoppel as a defense may not be segregated from defendants' basic contention, namely that there be a re-examination of the rule of the law which requires that the provisions of an option plan be reasonably calculated (or the facts and circumstances surrounding a plan such) to insure that the corporation issuing options will receive in return the expected benefits. It is urged that this rule should not apply to a situation such as the one here in which years have elapsed since the options under attack were issued and acted on, and where the corporation has long since allegedly received the benefits bargained for.
In my opinion, the only type of estoppel which could be successfully advanced as a defense in the situation presented here must necessarily be found in defendants' response to the grant of promised options and not in any claimed misrepresentation or concealment on the part of the promisor, the option plan and its factual workings having been fully disclosed to each optionee. However, assuming defendants have shown reliance on a promise which the promisor should reasonably have expected to induce and which did induce action or forbearance of a definite and substantial character, such cannot be deemed to create a binding contract in order to avoid injustice or hardship if the promisor had no power to make the promise relied on.
Thus the dispute before me reverts to the critical question of whether or not the options here involved were validly granted. The options having in effect been given,[6] I am unable to discern how any action taken by defendants in reliance on such options can convert into binding contracts what were, at the time they were made, gifts of corporate assets.
The individual defendants' motions to dismiss and for summary judgment will be denied.
Order on Notice.
NOTES
[1] For earlier steps in this litigation see opinion in Del.Ch., 128 A.2d 801 and opinions therein cited.
[2] The board of directors in fact sought to ratify the transactions complained of by its resolution of September 16, 1953.
[3] Kerbs was decided on July 17, 1952 and reargument was denied on August 28, 1952, 33 Del.Ch. 174, 91 A.2d 62, 34 A.L.R.2d 839.
[4] American Hardware Corp. v. Savage Arms Corp., Del., 136 A.2d 690 is concerned with adequacy of notice of a stockholders' meeting and not with laches.
[5] Subdivision 5, § 33, Article 3, Chapter 41, Consolidated Laws of New York.
[6] "Absent an employment contract, if the terms of a stock option permit exercise by the employee for the full number of shares at any time after issuance, then no amount of evidence tending to prove the advantage of the optionee's remaining with the corporation will suffice to rebut the inference that the corporation has not received adequate consideration." 52 Col.Law Review, 1003 at 1014.