William ELSTER, Plaintiff,

v.

Thomas W. ALEXANDER, Nathan T. Bascom, Roger C. Damon, Ben S. Gilmer, Robert L. Gordon, Jr., C. Coleman McGehee, Joseph P. McMurray, Huger Sinkler, Edward D. Smith, Addison H. Reese, Lawrence A. Wilson, First & Merchants Corporation, F & M Tri–South Corporation, First National Holding Corp., First Atlanta Tri–South Corporation, NCNB Corporation, NCNB Tri–South Corporation, Tri–South Management Associates, Tri–South Management Mortgage Investors and Price Waterhouse & Co., Defendants.

No. 1:75–cv–1069–CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 28, 1988.

As Corrected Nov. 15, 1988.

Irving Bizar, Bizar D'Alessandro Shustak & Martin, New York City, Edward L. Savell, Savell, Williams, Cox & Angel, Atlanta, Ga., for plaintiff William Elster.

Ronald L. Reid, Nill V. Toulme and Sydney S. Cleland, Alston & Bird, Atlanta, Ga., for defendant Price Waterhouse.

Gary Hatch and Barry Harris, Hansell & Post, Atlanta, Ga., for all other defendants.

## ORDER ON DEFENDANTS' MOTION FOR ATTORNEYS FEES

MOYE, Senior District Judge.

William Elster filed his complaint on June 5, 1975 alleging jurisdiction under Section 27 of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a, *et seq.*, and pendent jurisdiction. At that time, plaintiff owned 25 shares of Tri–South Mortgage Investors stock which he had bought June 29, 1973 for $840.47. Tri–South Mortgage Investors (a trust) (hereinafter "Trust" or "TSMI") was then an Internal Revenue Service qualified real estate investment trust engaged in investing principally in short-term first mortgage construction and development loans. (Original Complaint, Vol 1, Doc. 1, ¶ 10).[1] For his substantive cause of action plaintiff alleged (Vol. 1, Original Complaint, ¶¶ 17, 31):

---

**1.** Citations, where possible, will be to the prior   Appellate record.

17. Defendants entered into the plan since in or about 1972, to conceal from holders and purchasers of Trust's Shares and from the investing public the true picture of Trust's financial condition and operation. All acts and events alleged were performed in the furtherance of the aforesaid plan by each defendant and with knowledge thereof, and each defendant joined in, participated in and aided and abetted each other defendant in the plan and the violations alleged.

\* \* \* \* \* \*

31. The defendants aided and abetted each other in fully and knowingly participating in, or on behalf of the business entities named herein as defendants, the said plan, and in the issuance of the false and misleading documents which they caused Trust to file with the Securities and Exchange Commission and to distribute to the plaintiff and the public, including but not limited to financial statements, reports and supporting proxy materials of the Trust during the relevant periods.

Following many procedural disputes, the elapse of substantial time, and an interlocutory appeal, plaintiff served on January 24, 1980 his "Second Amended Complaint," upon which trial subsequently, but much later, was had. (Vol. 4, Doc. 64). The plaintiff's Second Amended Complaint confined itself to allegations of violations under section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (Vol. 4, Doc. 64, ¶ 2). The factual allegations, which were virtually identical in the original and amended complaints, were (from "Second Amended Complaint"):

"18. Defendants, including Price, entered into a long continuous plan and conspiracy to conceal from the holders and purchasers of Trust's shares and the investing public, the true picture of its poor financial condition and operation, the true condition of the loans made by Trust, the extent to which said loans were problem and defaulted loans and to substitute therefor inflated picture of Trust's earnings, the date of the commencement of said plan and conspiracy being presently unknown. All of the acts and events alleged hereinafter were performed in furtherance of said plan and conspiracy.

"19. Pursuant to the aforesaid plan and conspiracy, defendant Trust and the individual defendants issued, filed and circulated for Trust, the following interrelated statements, among others, prospectuses dated February 8, 1972 and February 6, 1973, quarterly reports for all quarters in the calendar year 1973 including the quarter ended December 31, 1973; and for all quarters for the calendar year 1974 through September 30, 1974, including the quarterly reports for the periods ending June 30 and September 30, 1974; and an annual report for the year ended December 31, 1973. The prospectuses and the annual report contained financial statements certified by defendant Price. All of the defendants reviewed all of the statements. The aforesaid statements were false, fraudulent and misleading and known or should have been known, to be such by the defendants. Price knew or should have known, at the time it certified the aforesaid financial statements, of the alleged material misstatements contained therein.

"20. (a) Each of the foresaid statements purported to show that Trust had substantial income from its mortgage loan investments; its mortgage loans [sic] investments were safe and secured; Trust was extremely careful and prudent in its making of mortgage loans [sic] investments; Advisor carefully managed Trust's mortgage loans portfolio; in the rare happenstance of a loan default, Trust would sustain no significant loss in income or in principal.

"(b) Thus, the prospectuses dated February 8, 1972 and February 6, 1973, at pages 13 and 15 thereof, among other places, respectively, stated that the reserve for possible loan losses were [sic] adequate.

"(c) The prospectus dated February 8, 1972, at page 13 also stated that the Trust has, from time to time, granted extension of loans made and that no such extension had been the result of any concern for possible repayment. Such statement was

carried forward to the prospectus of February 6, 1973 at page 14.

"(d) The prospectus of February 8, 1972 further stated that with regard to a $7,800,000.00 construction loan commitment in respect of which, as of December 31, 1971, $2,391,564 had been funded by the Trust and it might be required to fund up to $950,000 of cost overruns exclusive of added interest costs, the Trust would not sustain any loss of principal or interest.

"(e) In the prospectus dated February 6, 1973, at pages 14–15, two loans then in default were described with the statement that the Trust expected to be paid, with respect to an apartment project located in North Carolina, the principal balance of the loan, plus all accrued interest and with respect to a second loan in default located in Houston, Texas, the Trust was sufficiently protected from any loss of principal. The prospectus went on to state, regarding a foreclosed apartment project in New Orleans, Louisiana and with respect to described advances made by Trust therein that the value of the completed project would be sufficient to protect the Trust from any loss of principal. The prospectus further stated that except for the foregoing, none of the loans of the Trust was in foreclosure nor was any loan in arrears as of January 31, 1973.

"(f) The quarterly report for the period ended December 31, 1973, in comments to shareholders, represented that 'the problem loans of Trust are manageable and should have no significant impact on future earnings.' It further stated that with respect to two public housing projects, a loss of $200,000 was sustained as to one loan (having an outstanding balance of $576,-000) and that an estimated loss on the other loan (with an outstanding balance of $410,-000) would range between $200,000 to $250,000. It further stated, with respect to a condominium loan and a land loan, no loss of principal or interest was expected. The report stated that Trust had no other loans on which it expected to incur a loss of principal or interest. The report also stated that the Forest Isle Apartment Project previously acquired by foreclosure, was now being treated as an equity investment and Trust anticipated that the project would have positive cash flow and profits in 1974. The report concluded with a representation that Trust's loan loss reserve of $1,043,000 was adequate to meet all known contingencies.

"(g) The annual report for the year ended 1973 stated that the Trust had been fortunate to avoid major problems and that its reserve for possible loan losses was adequate. In Note 2 to the Financial Statements, it was stated that the loan loss reserve was considered adequate as of December 1, 1973 and that loan losses totaling $200,000 were charged against the reserve in 1973.

"(h) In the quarterly report for the period ended June 30, 1974, it was stated therein that, with respect to two projects involving an investment of $5.8 million, then carried as non-earning, negotiations were in process to transfer these properties to new borrowers with no loss of interest or principal and that when negotiations were completed and the projects transferred, back interest would then be recorded and future accruals of interest continued. The report further stated that the New Orleans apartment project continued to rent at a satisfactory rate with a positive cash flow and that it was anticipated that the project would be in a profitable position before year-end.

"(i) There were other statements and representations made therein which were false and fraudulent.

"21. The said statements were false and fraudulent for the following reasons, among others:

"(i) They omitted to state all of the material facts which would show that all of the loans made by Trust were risky in that the borrowers-builders invested little or no funds of their own, were developing property which was overappraised and improperly valued, and that the cost estimates for such construction were too low;

"(ii) The provisions for reserves for possible loan losses were inadequate for the reasons set forth below:

"(iii) They omitted to reveal the true extent of problems loans in default. Thus, in its report to shareholders for the year 1972, Trust Statement of Financial Position as of December 31, 1972, showed 'property acquired by foreclosure' at $3,788,134 but in its report to shareholders for the year 1973 Trust's Statement of Financial Position as of December 31, 1973 showed no asset entitled 'property acquired by foreclosure' and showed, instead, asset entitled 'equity investment in real estate' in the amount of $5,736,153. Such 'equity investment' was, in fact, property acquired by foreclosure and the amount had materially increased by almost $2,000,000 in one year;

"(iv) Each of the documents set forth above estimated values of problem loans and defaulted loans and stated the lack of anticipated loss as to the principal or interest with respect thereto. They failed to set forth the fact that under exiting regulations and law, Trust could not hold property primarily for sale to customers in the ordinary course of its business, and, hence, there was substantial doubt that the anticipated value would be realized upon sales of foreclosed properties to third parties;

"(v) The prospectuses failed to disclose, in connection with the statements made with respect to extension of maturity dates and the claim that, other than three loans referred to, no loan was in arrears as of January 31, 1973, that the various loan modifications and extensions granted included, among other things, increasing the amounts of loans and applying the proceeds of such increases to curing and removing interest and other arrearages existing with respect to such loans; that many of such loans which were granted extensions and modifications were otherwise in default; each of the defaulted loans which had been described in the documents had had earlier modifications.

"(vi) The $7,800.00 construction loan commitment set forth at page 13 in the February 1972 prospectus, as to which it was stated therein, that the Trust might be required, inter alia, to fund $950,000 of cost overruns and would not sustain any loss of principal and interest, resulted, at that time and thereafter, in loss of interest and principal to Trust and in causing Trust to expend more than $950,000 of the cost overruns;

"(vii) The two loans described at page 14 of the February 1973 prospectus, as being in default, with the statement that the Trust expected to be paid—so far as the North Carolina apartment project—the principal balance of the loan, plus all accrued interest and expected to be paid all principal with respect to the Houston, Texas loan was unwarranted in that there was no reasonable expectation that the Trust would be paid all interest and principal;

"(viii) The statement made in the December 31, 1973 quarterly report to the effect that the problem loans of Trust are manageable and would have no significant impact on future earnings, was unwarranted in that, during the quarter ended December 31, 1973, the daily average of the Trust's non-earning assets amounted to approximately $13,530,000 as compared with the daily average of non-earning assets for full year of 1972 in the amount of approximately $3,061,000. Thus, there was no basis for the statement in the light of Trust's own experience and conditions and experience in the real estate industry.

"(ix) The statement contained in the February 1973 prospectus at page 15 that none of the loans of the Trust was in foreclosure as of January 31, 1973, was misleading in that it omitted to inform the public that the defendants refused to institute foreclosure proceedings though many of the Trust's loans were in default in order to conceal the true condition of Trust and its problem loans.

"(x) The statement in the quarterly report for the period ended December 31, 1973 with respect to the two public housing projects and a condominium loan and a land loan were false in that Trust sustained losses substantially greater than those set forth and sustained losses of principal and interest with respect to the condominium and land loans described.

"(xi) The statement contained in the quarterly report for the period ended December 31, 1973 that Trust had no other

loans on which it expected to incur a loss of principal or interest, was misleading in that defendants failed to disclose that Trust had loans then extant which were in default on which there was [sic] substantial amounts of interest and principal arrearages; and that Trust had granted substantial modifications and increased borrowings to cure prior arrearages; and that in the light of the large amount of Trust's non-earning assets of December 31, 1973, Trust could expect to incur further losses of principal or interest.

"(xii) The statement contained in the December 31, 1973 quarterly report concerning the Forest Isle apartment project was misleading in that there was no basis on which defendants could anticipate the project would have a positive cash flow and profits in 1974; indeed, said project has to date still not been profitable.

"(xiii) The annual report for the year ended December 31, 1973 and statements contained therein, with respect to the adequacy of the reserve for possible loan losses and that the Trust has been fortunate to avoid major problems, was misleading in the light of the allegations set forth herein and the fact that defendants did not disclose that they were concealing the true financial condition of Trust and its problem loans.

"(xiv) The statements in the quarterly report for June 30, 1974 with respect to the references contained regarding negotiations in process to transfer two projects to new borrowers and the anticipation that upon conclusion of such negotiations, back interest would be recorded and future accruals of interest continued, were unwarranted in the light of the then status of negotiations. The further statements with respect to the anticipated profitability of the New Orleans apartment project were equally unwarranted in that there was no basis to anticipate a positive cash flow or a profitable position before year-end, and the project has not achieved such goals.

"(xv) All of the aforesaid loans had accruals of interest recorded in Trust's income accounts, though such accruals should not have been maintained and upon the status of defaults, as described above, should have been reversed. The effect of non-reversals and inclusion of each accruals was [sic] to inflate the income of Trust.

"(xvi) There were other facts which made the said statements false and fraudulent.

"22. Each of the aforesaid documents viz, 1972 and 1973 prospectuses, the annual report and the quarterly reports, described above, contained financial statements and textual material in which Trust's shareholders' equity, Trust's net income and earnings and assets were set forth. Said items were false and fraudulent and overstated for the following reasons:

"(i) The allowance for loan loses provided in respect of Trust's loan portfolio and investments as of the balance sheet dates and the provisions made to each financial period for loan losses charged against Trust's income were inadequate. Thus, as of December 31, 1970, Trust's allowance for possible loan losses was $8,820, or .00032% of Trust's total investments. As of December 31, 1971, Trust's allowance for possible loan losses was $153,686 or .0025% of Trust's total investments; as of December 31, 1972, Trust's allowance for possible loan allowances was $558,626 or .0044% of its total investments; as of December 31, 1973, Trust's allowance for possible loan allowances was $1,042,673 or .0050% of its total investments; as of September 30, 1974, Trust's allowance for possible loan losses was $1,925,181 or .0082% of its total investments.

"(ii) Provisions for Trust's loan losses were made, based upon an arbitrary amount of Trust's net income. Such provisions were inadequate for the reasons, *inter alia*, that the amount of percentage of net income chosen was deliberately low because defendants intentionally wanted the financial statements to overstate earnings and assets. Provisions for loan losses should have been made, based upon a percentage of the mortgage loans and investments outstanding and should have included provisions not only for loan amounts believed to be doubtful of collection but also for loan amounts that could be expect-

ed to become uncollectible based on long term experience of the real estate industry. Provisions for Trust's loan losses were unreasonable in that many of the mortgage loans made by Trust during the period constituted a high percentage of the total, if not the entire, cost of projects undertaken by borrowers and/or were construction or other types of what is known as 'exotic financing' which increased the risk of default and loss on the loans to Trust; in addition, no provision was made for the fact that many of the loans were already delinquent and/or in default.

"(iii) Trust did not write off against its already established reserve for possible loan losses, mortgage loans already substantially in default and which Trust knew were uncollectible and losses which it had sustained, or knew it would sustain. Anticipated losses on the delinquent and defaulted loans described in Paragraphs 20 and 21 above should have been written off against the established reserve for possible loan losses.

"(iv) Trust included in its income, accruals of interest where the borrowers had defaulted or had been delinquent, Trust considering a loan to be delinquent if required payments or principal or interest are ninety days or more overdue. Such accruals should not have been made. As of January 31, 1973, Trust was not accruing interest on approximately $2,000,000 of mortgage loans. As of June 17, 1974, approximately $26,000,000 or 11.3% of Trust's investments were non-earning as of June 30, 1974. As of September 30, 1974 approximately $55,251,000 or 23.5% of Trust's investments were non-earning. Each of the loans described in Paragraph 20 above, in addition to others, which were in default and foreclosed, had had interest accruals thereon included in Trust's income when defendants knew that such interest would never be paid.

"(v) From time to time, Trust foreclosed upon certain of its delinquent mortgages and obtained possession of the underlying properties. To avoid disclosing the resulting losses and the existence of problem loans, defendants caused Trust to capitalize accrued and unpaid interest on the properties acquired by foreclosure to show foreclosed properties in its financial statements with a caption 'Equity Investments in Real Estate,' and to make arrangements to transfer certain foreclosed projects to new borrowers. The loans described in paragraph 20 above when foreclosed by Trust had their accrued unpaid interest capitalized so that Trust's income statement would not be affected and the assets not reduced but, instead, increased. The transfers of foreclosed properties to new borrowers were not, in fact, bona fide and true transfers. They were made on terms which were not at arms' length and which would not have been given by Trust had they been made in good faith as a result of arms' length bargaining.

"(vi) To conceal the fact that certain of its mortgage loans were in default, Trust was improperly caused to enter into extensions, modifications and other arrangements with defaulting borrowers so that such loans would not be classified as being in default or problem situations upon its records and thus disclose poorer financial results.

"(vii) Trust failed to set up reserves and other proper and warranted provisions for increasing interest expense which Trust must pay and could be anticipated to pay to continue to have cash available for its business purposes.

"(viii) Defendants concealed the fact that in order to generate Trust income, Trust was caused to make highly speculative and exotic loans to builders who, themselves, had inadequate capital. Thus, Trust, knowingly and purposely loaned construction money and created 'exotic' loan packages in highly speculative situations to borrowers who would be likely to default because of their thin equity or questionable financial state. Trust did not fully investigate such borrowers or such proposed investment situations and failed to supervise adequately or schedule the monies being loaned and the value and purposes for which they were being spent.

"(ix) The statements were false and fraudulent for other reasons as well. De-

fendants concealed the identity of, the status of, the extent of delinquencies and defaults and the modifications and extensions and increased borrowings respecting all of Trust's delinquent and defaulted loans reflected or not on the statements during the period of January 1, 1973 through September 30, 1974 and, except as outlined above, plaintiff can supply no further details until discovery.

"23. Defendants further concealed the fact that advisory fees paid by Trust to Advisor under a contract were excessive and unreasonable in that the fees were computed upon calculations which included the full principal amount of closed mortgage loans made to borrowers and the undisbursed commitments for such loans even though such undisbursed commitments might never be paid or were never paid; were based upon calculations which included closed mortgage loans even though said mortgage loans were in default and had not been repaid; were out of all proportions to the services in fact rendered by Advisor; were excessive as compared to fees charged by independent advisors for similar services. Such fees were also inappropriate and excessive for other reasons."

Jury trial was had August 7–27, 1985, the jury being required to enter special verdicts on numerous interrogatories. The first, and basic, interrogatories were designed to elicit jury findings as to whether any misrepresentations at all, fraudulent or not, had been made as claimed by plaintiff. With respect to each and every document which plaintiff alleged contained multiple and numerous misrepresentations, the jury found in response to specific interrogatories that such document contained no misleading statement at all. (Vol. 11, Doc. 196). The Court's judgments granting directed verdicts as to defendants Alexander and Wilson (Vol. 11, Doc. 197) and in favor of all other defendants on the jury's verdict (Vol. 11, Doc. 198) were affirmed on appeal, *Elster v. Alexander*, 811 F.2d 609 (11th Cir.1987).

The case is again before this Court on the defendants' motions to be awarded attorney's fees (Vol. 11, Docs. 199, 200) pursuant to Rule 11, F.R.Civ.P., 28 U.S.C. § 1927 and this Court's own inherent powers and on plaintiff's opposition thereto. A bill of costs in favor of defendants has previously been modified by the Court, and, as modified, approved, and there is no challenge thereto.

Rule 11, F.R.Civ.P. provides:

Signing of Pleadings, Motions, and Other Papers; Sanctions

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated. A party who is not represented by an attorney shall sign the party's pleading, or other paper, and state the party's address. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the plead-

ing, motion, or other paper, including a reasonable attorney's fee.

The last sentence of Rule 11 became effective on August 1, 1983. Its purpose is set forth fully in the notes of the Advisory Committee on Rules which notes the Court has considered carefully in arriving at this opinion.

Amended Rule 11 went into effect 8 years after the commencement of this litigation; 5 years have since elapsed. It is applicable to all pleadings and papers filed after August 1, 1983. *Pantry Queen Foods v. Lifschultz Fast Freight*, 809 F.2d 451, 454 (7th Cir.1987).

The United States Supreme Court's order promulgating the 1983 amendments (including that to Rule 11) states that they (the amendments) "shall take effect on August 1, 1983 and shall govern all civil proceedings thereafter commenced and, insofar as just and practicable, in proceedings then pending." 97 F.R.D. 165 (1983). Although Rule 11 is applicable to any filing after August 1, 1983 in a pending case, the Supreme Court's order does not support the application of the Rule to prior filings. *Hashemi v. Campaigner Publications, Inc.*, 784 F.2d 1581 (11th Cir.1986). The new language was designed to deter improper filings and to induce lawyers to do better research. As the Advisory Committee's notes state: "The word 'sanctions' in the caption ... stresses a deterrent orientation in dealing with improper pleadings, motions or other papers." A rule cannot deter conduct that is completed before the rule's adoption; people cannot comply with rules that do not exist.

Subsequent to August 1, 1983, plaintiff filed among others, the following pleadings and papers:

(1) *September 30, 1983.*—Motion for discovery, with brief (Vol. 7, Doc. 128);

(2) *October 14, 1983.*

Application by plaintiffs for order vacating prior orders staying discovery on the merits (Vol. 7, Doc. 130);

(3) *January 4, 1984.*

Twenty–Day Statement (a document required by this Court to be jointly filed so the Court will know the contentions of the parties as to future proceedings as well as the merits) (Vol. 7, following Document 139);

(4) *November 1, 1984.*

Plaintiffs' motion, with affidavits, for ruling requiring witnesses to answer, and supporting memorandum, (Vol. 8, Document 144);

(5) *November 13, 1984.*

Plaintiffs' motion, with affidavit, for ruling. (Vol. 5, Doc. 145);

(6) *December 31, 1984.*

Plaintiffs' motion for rehearing, reargument and clarification of Court's order of December 14, 1984, and plaintiff's motion for rulings. (Vol. 9, Doc. 155);

(7) *February 11, 1985.*

Notice to take deposition of Michael H. Bagot. (Vol. 9, Doc. 160);

(8) *February 28, 1985.* Motion to compel appearance of Edward Harris. (Vol. 9, Doc. 160);

(9) *May 23, 1985.*

Proposed pretrial order submitted jointly with defendants. (Vol. 9, Doc. 166);

(10) *August 6, 1985.* Plaintiff's Request to Charge (Vol. 10, Doc. 179);

(11) *August 6, 1985.* Plaintiff's trial brief (Vol. 11, Doc. 180).

Rule 11 was applicable to the plaintiff's filing, through his attorney, of the above eleven documents. It is therefore necessary next to determine whether the filing of those documents was in violation of the requirements of Amended Rule 11.

Plaintiff's substantive complaint, originally and as amended, consisted almost entirely of plaintiff's conclusory allegations that statements in documents which defendant Trust was required by the Securities and Exchange Commission to file were false and fraudulent—that is untrue *and* made with the intention to deceive—by virtue of a conspiracy involving the corporate defendants and their officers and trustees.

Despite vigorous and repeated efforts by defendants to secure greater particulariza-

tion, the Court decided to let the case go to trial on the second amended complaint hoping discovery would serve sufficiently to particularize plaintiff's contentions as to enable an intelligent defense and by reason of the Court's perception that the ultimate questions of truth, fraud and deceit *vel non*, necessarily would turn out to be jury issues. The former hope never materialized, and the entire gamut of defendant's actions during the class period remained at issue until trial.

The period prior to the filing of plaintiff's pleadings referred to hereinabove in this order was devoted almost entirely to setting the issue framework for the case. The case was no further advanced on the merits at the end of that period than when the case was commenced, as is apparent from plaintiff's portion of the 20–day statement filed on January 4, 1984 (Vol. 7, Doc. 139 pp. 1–4):

Plaintiff feels at this time that he cannot more discretely define the issues since there has not yet been any merits discovery. Merits discovery was stayed by orders of this Court since 1975. This Court vacated all prior stays by an order dated October 28, 1983. The Court's attention is respectfully directed to Plaintiff's Contentions as set forth in Part B of this document for a more complete statement of the allegations involved.

Plaintiff contends that he has been completely stymied for seven years in his efforts to determine and identify witnesses to be deposed and documents to be produced. These efforts include numerous interrogatories served upon all defendants, as well as numerous notices to produce documents for discovery and inspection. [footnote omitted]

Plaintiff believes that defendants' answers to interrogatories and their production of documents will enable plaintiff to more fully set forth a precise statement of anticipated discovery.

At present, plaintiff plans to seek discovery by interrogatory and deposition of the following witnesses: (a) all knowledgable officials, agents, employees of Tri–South; (b) all defendants; (c) the partners of Price Waterhouse in charge

of, and all participants in the audits by, Price Waterhouse of defendant Trust; (d) the partner of Price Waterhouse and all other participants in charge of the client.

Moveover, plaintiff plans to request production of documents of the above mentioned witnesses. Such documents will include, *inter alia*, any written recording or entry in minute books or any memorandum regarding meetings among defendants during the relevant time period, communications between the defendants, communications between defendants and the SEC, communications regarding the annual reports prepared for the corporation, documents relevant to the preparation of proxy material sent to shareholders, audit files and transactional documents.

\* \* \* \* \* \*

As noted above, plaintiff contends he cannot make a more precise statement as to the extent of discovery he anticipates until he has had opportunity to inspect such documents. Moreover, no agreement has yet been reached regarding outstanding interrogatories. The parties have agreed to defer confer again regarding discovery and thus have further agreed to defer making recourse at this time to the Court regarding discovery disputes. The parties have similarly agreed to defer making any application to the court for a more extensive and comprehensive discovery than anticipated in this Court's Order for 20 Day Statement.

It can be noted, however, that plaintiff does anticipate that more comprehensive discovery will be necessary due to the complex nature of this action, the number of defendants and the nature of the parties involved. The parties here include nine highly placed corporate individuals and nine corporations, each corporation with its own set of relevant documents.

Thus, except for having learned the identity of some of the loans made by defendant Tri–South Mortgage Investors, plaintiff

evidenced to the Court no more reason to allege fraudulent conduct by defendants with respect thereto on January 4, 1984 than he had evidenced on June 5, 1975, 9 years previous. (See "Selected Chronology", filed January 24, 1987). All merits discovery took place after the effective date of Rule 11.

■ The Court believes that any lawyer who files a complaint in federal court should make an investigation, the result of which, at the minimum, is the lawyer's reasonable belief that it is reasonably probable that a bona fide legal cause of action exists (not, of course that it actually will result in a judgment). The Court finds that the plaintiff's ability to cull defendants' published financial documents and to pinpoint in hindsight, statements which subsequent unforeeable events have proved too optimistic, is not investigation of the quality required by Rule 11.

In his deposition on January 8, 1976, the plaintiff himself recognized the prime cause of the poor performance in 1974 of which he complains as the well-known, unprecedented inflation, resulting in what now appears, and then also appeared, to be an astronomical interest rate—a factor obviously far beyond defendants' control (Elster depo., pp. 44–45, *passim*). It is interesting that plaintiff in 1976 himself attributed the poor 1974 results to management's failure to anticipate escalating future interest rates and maintenance costs (both critical factors in defendants' business) rather than to management's fraudulent concealment of a single bad loan (Elster depo., supra.) Failure to anticipate is diametrically opposite to intentional failure to disclose—nor are escalating future interest rates or maintenance costs what the defendants are charged with concealing.

Why then did Mr. Elster, who testified as to how well-read he was in the stock market affairs, bring suit, (not only against defendants herein, but also at the same time two other real estate investment trusts in Florida and California)?

At page 46 of the deposition referred to above, Mr. Elster testified:

Well, of course, the amount was negligible. I came to a conclusion that this was a real ripoff[2] and I went and discussed it with my attorney and they referred me to Mr. Bizar, and evidently his firm investigated my complaint and they thought they had a basis and I agreed with them 100 percent.

He pointed out, p. 47, that he would have only a Four or Five Hundred Dollar loss.

His investments in the other two REITS likewise were minimal, (Vol. 3, Doc. 51).

However, two other factors were not mentioned by Mr. Elster.

1. Mr. Elster, the plaintiff here, is the Mr. Elster who was plaintiff in *Elster v. American Airlines*, Court of Chancery of Delaware, 34 Del.Ch. 94, 100 A.2d 219 (1953), 34 Del.Ch. 505, 106 A.2d 516 (1954), 34 Del.Ch. 500, 106 A.2d 202 (1954), 36 Del.Ch. 213, 128 A.2d 801 (1957), and 38 Del.Ch. 195, 148 A.2d 343 (1959), and *Beard v. Elster, et al.*, Supreme Court of Delaware, 39 Del.Ch. 153, 160 A.2d 731 (1960). Mr. Elster's earlier case also was a Rule 23(b) type class action.

It is interesting to note that Mr. Elster's complaint in the 1950–1960 actions showed that he had been the owner and holder of 25 shares of common stock of defendant American Airlines since June of 1951, whereas he complained of the defendant's granting of stock options to 30 of its executive employees on September 12, 1950,—9 months before Mr. Elster bought his stock (100 A.2d at 220). There is no reason to assume that Mr. Elster was not just as well-read, market-wise, in the 1950's as in the 1970's.

2. Plaintiff has advised the Court that there was "a meeting of REITS held in Mexico City in May 1973 in which the SEC spoke to the assemblage, informing them of its criticism of and its concern about, the practice of some REITS in providing loan loss reserves by a percentage of net income

2. Mr. Elster gives no reason why he chose the noun, "ripoff."

a practice followed by TSMI." (Vol. 8, Doc. 144).

Mr. Elster testified on deposition (23-25):

Q. (By Mr. Hatch) What did you mean, you did some reading about REIT's?

A. As I say, when I'm in Florida and I go with a friend of mine to the broker's office. He can read the tape. I can't read the tape, I'm not that knowledgeable. So while he's watching the tape and I browse around and they have all kinds of prospectuses and they have reports of companies and they have that wire that types out and I read those reports and from conversations with other investors down there, they mention about these REIT's which I never even had known about. I don't even know to this day when they started this REIT business. I started to get interested and whenever I saw any company, I don't even know how many REIT companies there are, there might be 100 or 50, I have no idea, but I read various articles from various companies and I read a prospectus of yours, Tri-South prospectuse. It was laying in the broker's office. I read Continental—well, Continental, that's another story. I read Barnett Mortgage because these guys down there swear by Barnett because most of them are Floridians, swore it's the best bank in Florida, so I read general articles. I read about stocks, too, but I had my own baby then and I wasn't particularly interested in anything except a little bit of this REIT, which is evident. There's not a million dollars involved in here, with all my wife's and my investment. I never figured it up, $25,000 involved, something in that category.

Q. What brokerage office was this where you read these various publications?

A. Well, when I was in Florida either Weiss Boyden or Loeb Rhodes. They changed the business or went out of business, but I knew Mr. Al Freelander, I knew him when he was in the Westchester office, and we used to go there and he got some business out of me. He got the Plaza and he got the—what you call it?—for my wife, two new issues. When I'm in New York, I went to either Nerberger Loeb, that' Sal Kahn, or I went to Burt Lax's office. It was Merkin & Company and they changed and now it's Forrester & Adams, 120 Broadway. That's where he's a broker today. So as I say, I can't read tapes so I would read and I found it more interesting. I'm an avid reader. I get library books, through library books and three days later the librarian sees me back and in three days I've finished three books. So I do a lot of reading.

The Court believes it to be more likely true than not that in purchasing TSMI stock on June 29, 1973, Mr. Elster drew on his experience in the *American Airlines* case and had in mind, by reason of the SEC warning, at the time of purchase of the defendant's stock at least the possibility of bringing a class-action suit. In view of the nature of Mr. Elster's portfolio (Vol. 3, Doc. 51), it is difficult to believe his miniscule purchases of stock in the defendant REITS were truly for investment purposes only, rather the amounts of such purchases indicate to the Court that Mr. Elster was following the pattern set by his American Airlines purchase in 1951.

This raises an interesting question. Final judgments for costs in this case, in excess of $10,000, have been awarded against Mr. Elster. It would be improper for his lawyers to pay them. Likewise, it would be improper for his lawyers ultimately to bear plaintiff's expenses of litigation which, in view of the location of plaintiff's counsel in New York, surely must have equaled the litigation expenses (apart from attorney fees) of defendants litigating on home ground (Vol. 3, Doc. 51).

In the Florida litigation, hereinabove referred to, the $150,000,000 cash settlement fund, of course, should have recouped Mr. Elster's actual expenses, if any had been incurred, but no more, over and above his own individual stock loss.

As to the Florida litigation, the record shows that in the *Florida* case, *Elster v.*

*Baker, et al.,* CV No. 74–709 (M.D.Fla., 1974), Mr. Elster owned 25 shares purchased for less than $700. The case was terminated by a Stipulation of Settlement and Dismissal on the basis of a cash settlement fund of $150,000, and warrants to buy 300,000 shares of Treco, Inc., successor to BMT. The warrants were to purchase 300,000 shares of Treco, Inc., common stock at 10 cents par value per share. The warrants could be exercised for three years at a purchase price of $4.87. The shares never reached a market price of even $4.00. Defendants have informed the Court, without contradiction by plaintiff, that the same sort of settlement arrangement was proposed to defendants herein by plaintiff in July 1980. Such an arrangement, based on theoretically possible but practically highly improbable possibilities, in this Court's opinion constitutes little more than a sham, a transparent attempt to evade a lawyers ethical responsibilities to his client where the result is a substantial fee to the lawyer and nothing for the clients who actually suffered stock losses. What did Mr. Elster get to compensate him for that "ripoff"—nothing but his out-of-pocket expenses in carrying on the litigation plus recoupment of a four or five-hundred dollar loss; Mr. Bizar, the attorney, presumably received the remainder of the $150,000 as his fee.

It also is interesting that in respect to the California case, plaintiff Elster's action was dismissed, apparently through a procedural default by his attorney. Mr. Bizar has informed the Court that Mr. Elster wished to bring a professional malpractice suit against his attorney in that case, a Mr. Ira J. Sand. A professional malpractice action alleging a loss of a few hundred dollars is Quixotic.

■ The Court finds that sanctions pursuant to Rule 11 F.R.Civ.P. are appropriate against both plaintiff, Mr. Elster, and his attorney, Mr. Bizar with respect to matters occurring after September 30, 1983 in that the pleadings and papers filed on behalf of

plaintiff from and after that date set forth above were filed without that reasonable inquiry which Rule 11 requires.[3] The Court finds that such failure was deliberate and intentional on the part of plaintiff and plaintiff's lead counsel, and the Court finds further that the pleadings filed after August 1, 1983 were not in pursuit of any legal cause of action genuinely believed by plaintiff or his counsel to exist at the time their documents were filed, but rather for the purpose of coercing a settlement from defendants to the benefit of plaintiff's counsel (and perhaps, in some unknown way, plaintiff?) and therefore constituted a violation of Rule 11. The Court imposes as a sanction therefor all attorneys fees reasonably incurred by defendants from and after October 1, 1983; in addition the Court imposes as costs against plaintiff and his attorney, and in favor of the government, the jury per diems necessarily and actually paid by the government with respect to the trial of this matter.

As to the period before October 1, 1983, sanctions, if any, must be imposed on the basis of the Court's inherent power to punish an abuse of its processes or pursuant to 28 U.S.C. § 1927 (as amended in 1980), or both. 28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.
> (As amended Sept. 12, 1980, Pub.L. 96–349, § 3, 94 Stat. 1156.)

The Court finds that this case was initially brought, and continuously maintained, in bad faith, vexatiously, wantonly and for oppressive reasons. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980). The Court finds that the bringing of this law suit, with no reasonable basis to assume

---

**3.** Defendants do not seek the award of attorney fees from plaintiff's local counsel. It has clearly appeared to the Court that local counsel's func-

tion in this Court was at that minimum level required by this Court's rules in a case where the lead counsel is non-resident.

the defendant's 1973 financial position was due to fraud rather than poor economic conditions which were and are so well known, to then seek massive discovery with a cut-off date that would involve practically every piece of paper generated by the REIT and every piece of paper generated by the accounting firm defendant in respect to its representation of the REIT clearly demonstrates that the plaintiff was merely "fishing" in the hope of securing support for what surely must be characterized as his "blunderbuss" accusations. Why otherwise so little differentiation in the complaints in the Georgia, Florida and California law suits. (See Vol. 2, Doc. 34, Exhibit B). Support for the Court's conclusion is found in several other matters:

Plaintiff's continuation of the litigation against certain individually named trustee defendants even after learning that they were not trustees during the period in question.

Plaintiff's last-minute attempt at the beginning of trial to dismiss *without prejudice* all of the *individual* defendants, thus indicating to the Court that their prior presence in the case as parties was only for the purpose of harassment and increasing plaintiff's "leverage" for settlement purposes through the embarrassment to the individual defendants. Contrast this action with the assertion of counsel in the twenty day statement (pages 601–02, *supra*) that the inclusion of these high placed individuals in the litigation made the proceeding more complex and would necessitate more extensive discovery.

It is clear to the Court that such requested dismissal on the brink of trial, after the named individuals had stood accused of gross fraud for 10 years, was solely due to plaintiff's desire first to eliminate any sympathy or respect the jury might have for numerous well-known citizens, as well as to have as a fall-back potential future litigation to use as a further wedge for settlement discussions if the case against the corporate entities was not successful.

Therefore the Court, in the exercise of its *inherent equitable powers* awards de-

fendants their reasonable attorney fees and expenses incurred in connection with this case prior to August, 1983, and against plaintiff and his lead counsel, Mr. Bizar, jointly.

Based upon the above findings and Conclusions, the Court therefore awards all defendants other than Price Waterhouse the sum of $240,973.00 as attorneys fees, as shown by Mr. Hatch's affidavit of November 24, 1987, and Price Waterhouse & Co. $307,238, as shown by Mr. Reid's affidavit of November 24, 1987, and assesses Court costs in the amount of $3,900.00 against William Elster and Irving Bizar.

SO ORDERED.

Let judgment enter.